Karol **FINLEY** et al., Plaintiffs-Respondents,

v.

**LINDBERGH SCHOOL DISTRICT** et al.,
Defendants-Appellants.

No. 36312.

Missouri Court of Appeals,
St. Louis District,
Division 1.

April 8, 1975.

**300**

Ziercher, Hocker, Tzinberg, Human & Michenfelder, George J. Bude, Clayton, for defendants-appellants.

Moser-Marsalek, Carpenter, Cleary, Jaeckel, Keaney, Daniel T. Rabbitt, Jr., Donald L. James, St. Louis, for plaintiffs-respondents.

DOWD, Judge.

A class action. This is an appeal by the Lindbergh School District and members of the Board of Education (hereinafter District) from a decision of the circuit court upholding a negotiations agreement between the District and the Lindbergh Community Teachers Association (hereinafter Association). The case was tried before the circuit court upon an agreed statement of facts.

Plaintiffs are certified teachers employed by the District and are in good standing. The Association at the time the suit was filed comprised 450 of the 540 teachers employed by defendant school district. The avowed purpose of the Association is to promote the welfare of teachers in the district, and to secure the optimum educational advantages for the students.

On December 12, 1967, the Association and the District entered into the negotiations agreement which is the subject of this law suit. The agreement is set out in the appendix to the opinion. On August 14, 1973, the Board of Education of the Lindbergh School District advised the Association that the District was considering cancelling the agreement, and ultimately did so by resolution dated September 11, 1973.

On August 30, 1973, plaintiffs filed suit in the circuit court, seeking a declaratory judgment that the agreement was binding, that the cancellation of the contract by the Board of Education was illegal, and that the defendants be required to honor the agreement. In Count Two of their petition, plaintiffs requested specific performance of the agreement.

The scholarly trial judge prepared a well reasoned opinion, findings of fact, and conclusions of law which we found helpful. The trial judge entered judgment in favor of plaintiffs on both counts. Defendants appeal.

Defendant-Appellants' first point on appeal is that the court below erred in ruling

that the agreement is valid and enforceable. Defendants contend that the agreement requires "collective bargaining" between a public agency and its employees, and therefore is a violation of § 105.510 RSMo.1969, V.A.M.S. (1971 Supp.), which prohibits certain public employees from forming labor organizations. More specifically, § 105.510 provides: "Employees *except* police, deputy sheriffs, Missouri state highway patrol, Missouri national guard, *all teachers of all Missouri schools,* colleges and universities, of any public body shall have the right to form and join labor organizations and to present proposals to any public body relative to salaries and other conditions of employment through the representatives of their own choosing." (Emphasis ours).

The crux of this case is whether the agreement is contrary to the prohibition of this statute. Our first task is to determine just what the statute prohibits. A crucial case in this area is City of Springfield v. Clouse, 356 Mo. 1239, 206 S.W.2d 539 (1947). *Clouse* held (at 542) that public employees have rights guaranteed by the First Amendment to the United States Constitution and Sections 8 and 9 of Article I of the Missouri Constitution, V. A.M.S., "to peacefully assemble and organize for any proper purpose, to speak freely and to present their views and desires to any public officer or legislative body." *Clouse* further held that these rights can be exercised individually, collectively, or through chosen representatives. The Supreme Court in *Clouse* was also faced with the question of whether a particular agreement between a public employer and its employees was collective bargaining. The court in *Clouse* began its discussion with an admonition not to confuse collective bargaining with the rights of assembly, petition and free speech. Persons are not engaged in collective bargaining with executive or administrative officers when they urge the administrators to exercise their discretionary authority within the standards and limits which they have received

from the legislature, or in asking them to make recommendations to the legislature. *Clouse, supra* at 543.

*Clouse* also explains the philosophy behind the rule that public employment can not become a matter of bargaining and contract. The rationale is that the whole matter of qualifications, tenure, compensation and working conditions for any public service involves the exercise of legislative powers. There can be no delegation of legislative powers, so it follows that such powers cannot be bargained or contracted away, especially not by administrative or executive officers who do not have legislative powers. "Although executive and administrative officers may be vested with a certain amount of discretion and may be authorized to act or make regulations in accordance with certain fixed standards, nevertheless the matters of making such standards involves the exercise of legislative powers." *Clouse* at 545.

Thus, we learn from *Clouse* that qualifications, tenure, compensation and working conditions of public employees are wholly matters of lawmaking and cannot be the subject of bargaining or contract. (At p. 545).

Having thus determined what is prohibited by the statute, we must now lay these guidelines alongside the agreement in question to determine if the agreement has run afoul of the statute.

Plaintiff Association contends that an almost identical agreement was construed as valid and enforceable by our Supreme Court in Peters v. Board of Education of Reorg. Sch. Dist. No. 5, 506 S.W.2d 429 (Mo.1974), hereinafter *Peters*. The factual situation in *Peters* is similar to this case; however, the posture of the *Peters* case was that of an appeal taken from a judgment dismissing plaintiff's petition. Defendant School District argues that the *Peters* case is distinguishable. We disagree, finding defendants' attempt to distinguish *Peters* unpersuasive.

In *Peters,* as in this case, plaintiffs were members of a Teachers' Association formed and operating for the purposes of promoting the welfare of the teachers in the district, as well as securing educational programs of the highest quality for the children of the district. Both associations represented a substantial number of the teachers in the district. Both agreements provided substantially the same provisions and procedures, to wit: The negotiations to be carried on were to deal with both revisions of current policies and the development of new policies. The agreements did not purport to deal with individual grievances. Each agreement provided a procedure whereby negotiations could be commenced by written notice, and both agreements allowed the use of consultants in areas where disagreement developed. Both parties agreed to exchange information in order to assist the negotiations. Tentative agreements were to be recorded as minutes and when approved by both parties, were to be entered as district policy. Each agreement had a section called "resolving disagreements" which provided for the appointment of a fact-finding committee to make advisory opinions and tentative suggestions for the resolution of disagreements. Both agreements made it clear that the school board retained the absolute right to make all final decisions and that the fact-finding body was advisory only. In addition, the agreement in the instant case is prefaced by the statement: *"The Board of Education, under law, has the ultimate responsibility for determining policies for the school district."* (Emphasis added).

We are thus convinced that both agreements are substantially alike, at least in the areas which have any bearing on this law suit.

We now turn to an inspection of the *Peters* case to see if there is any language there to aid us in the resolution of the issue presented, i. e., whether the agreement violates § 105.510 RSMo.1969, V.A.M.S. As to the section of the *Peters* agreement entitled "Resolving Disagreements," the court in *Peters* noted that the title was misleading. That section as construed by the court only provided for an attempt to resolve disagreements. The court found the fact-finding body to be advisory only; the Board would make any and all final decisions on matters within its jurisdiction, the opinion of any body or group provided in the agreement to be merely advisory. "The agreement does not provide otherwise and must reasonably be construed as providing recommendations that are only advisory." *Peters, supra,* 506 S.W.2d at 433. As said, the same provision "resolving disagreements" is part of the agreement here.

The court in *Peters* 506 S.W.2d at 433 went on to say that the agreement "only provides for consultations and recommendations and does not bind the board to accept any of them." The board does not have to do anything in regard to the advisory opinions. It may accept them or reject them.

So it is in this case. The language in the agreement clearly states that the board has the ultimate decision in every case. Certain language in the agreement was to the effect that the board "recognizes the responsibilities" to the community to negotiate in good faith and seek agreement. The negotiations as provided for in this agreement have been approved by *Peters*: "We do not consider Section 105.510 to prohibit the negotiations involved in this case because we consider them authorized under our rulings in the Clouse case." *Peters, supra,* 506 S.W.2d 432. We likewise conclude that the section requiring the mutual interchange of information on issues of disagreement will not alone elevate this negotiations agreement to the status of collective bargaining.

■ Defendant-Appellants argue that the cumulative effect of the provisions of the agreement raise it to a "collective bargaining agreement." We do not agree and we find the reverse to be true. Taken as a whole the agreement does nothing more than recognize that teachers have a neces-

sary and relevant input into the process of negotiations. That such a mixture of teachers and administrators is a benefit to the whole school district is conceded by the agreement itself.

This agreement is not "collective bargaining" as that term is used in the labor law field. The board has only agreed to accept the submission of an additional input into the framework of their decision-making process. The issue is not, as appellants frame it, whether this agreement requires collective bargaining or whether certain terms used in this agreement are also used in union agreements. The issue is whether the agreement entered into here offends the purposes of § 105.510 as construed by the *Clouse* and *Peters* cases. We find that it does not and the trial court properly so ruled.

Likewise, we also conclude that the Lindbergh Community Teachers Association is not a labor organization within the meaning of Section 105.510.

■ We find defendant-appellants' second point to be without merit. Defendants contend that in ordering the defendants to specifically perform and honor the agreement, the trial court rewrote the terms of the agreement since the Association "no longer represents the entire professional staff." As said, at the time the suit was filed 450 of 540 teachers employed by the District were members of the Association. Later membership in the Association was reduced to 237 members.

Defendants seem to argue that the Association's membership should be required to comprise the "entire professional staff" of the teachers employed by the District. Not so. An agreement where less than 100% of the teachers were members of the negotiating association has been upheld. *Peters,* supra. Likewise the trial court specifically found that the agreement did not bar other associations or individuals from participating in the negotiations between the District and the Association.

The complained of portion of the trial court's order is as follows: "The Court finds and hereby orders the defendants to specifically perform and to honor and abide by the terms of the Agreement, . . . and to negotiate and otherwise follow the procedures set out in the Agreement." We fail to perceive how this order in any way rewrites the agreement, since the order is to comply with the agreement as drafted.

Our holding that the trial court did not err in ordering specific performance of the agreement is in accord with our holding on the first issue that the agreement merely injects the teachers' viewpoint into the negotiations. It makes no sense to hold the agreement valid and binding and then deny specific performance, especially in cases like this where plaintiffs suffer no measurable pecuniary loss and where the loss of teacher input into the school district's policy is admittedly grevious. We further believe our holdings are supported by the strong public interest in having orderly procedures for formulating school policy, and in including teachers in the discussion of that policy.

The agreement being valid, the judgment is affirmed.

WEIER, P. J. and RENDLEN, J., concur.

## APPENDIX

### "PROFESSIONAL NEGOTIATIONS AGREEMENT

This agreement is made and entered into on this 12th day of December, 1967, by the Board of Education of the Lindbergh School District and the Lindbergh Community Teachers' Association, a professional organization affiliated with the National Education Association.

### PHILOSOPHY

The Lindbergh Board of Education and the Lindbergh Community Teachers' Asso-

ciation recognize that the development and operation of education programs of the highest quality, for the benefit of children and youth in the district, is a common goal of paramount importance. The establishment of procedures to provide an orderly method for the Board and the Association to discuss matters of mutual concern and to reach mutually satisfactory agreement on these matters is in the best interests of public education. It is also recognized that:

1. The Board of Education, under law, has the ultimate responsibility for determining policies for the school district.

2. The Superintendent is the chief administrative officer for the school system and has the full responsibility for the administration and efficient functioning of every aspect of school district operation. He is the primary professional advisor to the Board and also, a member and leader of the professional staff. His professional judgment, experience and understanding are available to the Board and the Association in the process of joint study of matters of mutual concern.

3. The professional teaching staff has the ultimate responsibility of providing the best possible education in the classroom.

4. Attainment of objectives for the educational program of the Lindbergh School District requires mutual understanding and cooperation among the Board, the Superintendent, the administrative staff, and the teaching personnel. Therefore, free and open exchange of views is desirable and necessary with all parties participating in deliberations leading to the determination of policy.

## RECOGNITION

1. The Board of Education recognizes the Lindbergh Community Teachers' Association as the representative of the professional staff for the purposes of negotiating and arriving at agreements on matters concerning the improvement and development of the educational program, salary welfare provisions, working conditions, and other areas of mutual concern. The Association shall not, however, be said to represent the administrative staff in areas where there is a conflict between administrative and teaching duties. It is understood that the negotiations to be carried on under this agreement shall deal with the revision of present policies or the development of new policies. Individual grievances related to these matters shall be dealt with under separate grievances procedures.

2. The Board will extend to the President of the Association a seat at all Board meetings and he will be notified of all official Board meetings and sent materials at the same time as the members of the Board.

3. The Lindbergh Community Teachers' Association recognizes the Lindbergh Board of Education as the representative of the public for the purposes of providing for the education of children and youth in the district consistent with societal demands and the prudent expenditure of public funds and for the assessment of the outcomes of the district's system of public education.

4. The Board and the Association recognize their responsibilities toward each other and the community for negotiating in good faith and seeking agreement on matters of mutual concern. They also recognize that the prime determinant of policy development and implementation is the quality of the educational program and the welfare of the children and youth.

5. It is recognized that professional personnel have the right to join or to refrain from joining any organization for their professional or economic improvement and for the advancement of public education.

## PROCEDURES

1. The Association shall consult with the Superintendent on the above listed

matters of mutual concern and make every effort to reach agreement through the school administrative channels.

2. When negotiating with the Board, the Association shall be represented by a Professional Negotiations Team, composed of four (4) members serving at the discretion of the Association Executive Committee.

3. A meeting of the Professional Negotiations Team and the Board may be initiated:

A. Upon written request by the President of the Association to the President of the Board.

B. Upon written request by the President of the Board to the President of the Association.

4. Such requests shall specify the subject matter to be negotiated.

5. Such a meeting shall be convened within thirty (30) days. The meetings shall continue at no more than two week intervals thereafter until (a) agreement is reached, (b) impasse is reached. If any item being negotiated remains unresolved after 45 days, either party may ask for the rendering of an advisory opinion on that item by the fact-finding committee.

6. The meetings for negotiations shall be open only to Board Members, the Negotiations Team, the Superintendent and his staff, except that consultants may be utilized.

7. The Board of Education, the Superintendent, and the Professional Negotiations Team mutually agree to exchange all available information on the matters to be negotiated under this agreement in order to assist the negotiators in developing intelligent, accurate, and constructive proposals and programs.

8. All effort will be made to reach agreement on any matter having fiscal implications no later than forty-five (45) days before the final adoption of the budget.

9. All negotiating shall be carried on in an atmosphere of mutual respect and courtesy in accordance with principles set down in the National School Board Code of Ethics and the Code of Ethics of the Education Profession.

10. Neither of the parties will take any action nor condone any action leading to the cessation or interruption of professional services to children of the district while negotiations are in process under this agreement.

11. While negotiations are in process, any release of information about negotiation sessions must be approved by both negotiating parties.

12. A summary statement of each negotiation session will be prepared, approved, and filed.

13. When agreement is reached, it will be reduced to writing and become a part of the official minutes of the Board of Education.

14. The agreement reached under the negotiation procedure shall become binding on the Association when it has been ratified by its membership.

15. This agreement shall continue in full force and effect from year to year unless written notice is given on or before April 1 of any year requesting that the agreement or sections thereof be renegotiated.

## RESOLVING DISAGREEMENT

The parties pledge themselves to negotiate in good faith such matters as have been enumerated in this agreement. However, recognizing the possibility of an unresolved disagreement, a procedure for resolution is necessary.

The method to be used, which retains the final decision authority of the Board, is that of a committee which serves as a fact-finding body and renders an advisory opinion within fifteen days, if possible.

After the rendering of an advisory opinion, the Board and the Association's Professional Negotiations Team shall convene with 14 days to discuss and act upon it.

The committee shall be formed as follows:

1. The Board shall appoint one (1) member.

2. The Professional Negotiations Team shall appoint one (1) member.

3. These two (2) appoint a third member, who shall serve as Chairman."